IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ELIZABETH SCHULTE,

                    Plaintiff,                    OPINION AND ORDER

    v.

                                              23-cv-322-wmc

KENNETH J. LENERS,
TOWN OF CEDAR LAKE, and
TOWN OF CEDAR LAKE BOARD OF SUPERVISORS,

                    Defendants.

---

Plaintiff Elizabeth Schulte brought this civil rights action under 42 U.S.C. § 1983 against the Town of Cedar Lake, the Town of Cedar Lake Board of Supervisors, and Kenneth J. Leners in his individual and official capacity as the Town Chairman of the Town of Cedar Lake.  Specifically, in her amended complaint, Schulte claims that defendants have been violating her rights under the First Amendment and Fourteenth Amendment since September 2022 by:  (1) enforcing a policy prohibiting "disrespectful" comments from being posted on the Town's website; (2) limiting participation at the Town's annual meeting to resident voters; (3) taking retaliatory action against her use of protected speech on their website; and (4) enforcing a vague moderation policy on their website.  Defendants have moved to dismiss all of plaintiff's claims (dkt. #8), which will be granted in part and denied in part for the reasons set forth below.

ALLEGATIONS OF FACTS[1]

A. Background

Schulte is an adult resident of Minnesota and co-owns a parcel of real property in the Town of Cedar Lake, Barron County, Wisconsin (the "Property"). Schulte uses and pays local taxes for the Property, on which she also stores a recreational vehicle in full compliance with local permitting and zoning requirements.

The Town of Cedar Lake, is a local government unit and municipality organized and existing under Ch. 60, Wis. Stats. The Town of Cedar Lake Board of Supervisors is the Town's governing body made up of up to three (3) elected and/or appointed supervisors. Kenneth J. Leners, is an adult resident of Wisconsin and is the elected Chairman of the Town Board.

The Town maintains an official website that contains information regarding the Town Board's agendas, meeting minutes, contact and term information about its governmental officials, ordinances and resolutions, a calendar for upcoming Town meetings and actions, and other miscellaneous updates and posts related to the Town's business. Before September 22, 2022, there was a public comment section at the end of each post. The comment sections allowed anyone to express their thoughts or opinions and carry on discussions with one another. The comment sections contained no restrictions or limits on

---

[1] In resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint, as well as all matters of public record, not only as true but viewed in a light most favorable to plaintiff, drawing all inferences in plaintiff's favor. *Killingsworth v. HSBC Bank Nev.*, 507 F.3d 614, 618 (7th Cir. 2007). The following facts are drawn from Schulte's amended complaint (dkt. #6), except as otherwise noted.

the content that could be expressed in response to a post and had no policy or practice restricting participation or content.

**B.  The September 2022 Post**

In early September, Town Board Chairman Leners uploaded a post to the Town's website titled "Update on Recreational Residential Dwellings." Leners' post was critical of recreational vehicle use and advocated for further regulation in the Town, including questions such as:  "When is enough, enough?"; "Will another 100 or 200 more unlicensed campsites be allowed before action is taken even though homeowners currently pay 94% of all township expenses and unlicensed campsites pay only 6% of all township expenses?"; and "Why are non-residents given priority over residents?"

In response, plaintiff Schulte commented by:  providing additional context for the types of properties Leners addressed; criticizing the methodology used to present data; denouncing some facts that Leners highlighted; and questioning Leners' motivation for sharing the information.  As more comments were added to Leners' September post, he attempted to moderate the discussion.  He stated that some commenters would be prohibited from future postings to the Town's official website due to their previous comments being "disrespectful."  Unsurprisingly, Leners response prompted further comments on his authority to moderate the conversation on the Town's website.  Next, on September 21, 2022, several comments, including those left by Schulte, were deleted, with the remaining comments on the September post deleted at a later date.

During the Town's October Board meeting, the topic of allowing and managing comment sections on the Town's website was addressed.  Specifically, with respect to his

deletion of comments on the September post, Board Chairman Leners explained that he acted "[b]ased on what [he] perceived to be as derogatory comment, [he] wasn't going to call a special meeting for it. . . . So [he] made a judgment call."  This was the end of their discussion on the steps that Leners took to try to moderate the tenor of the comments. Although no vote was taken as to the Leners' conduct, the Board eventually voted unanimously to end the comment sections on its website altogether.  All comments on the September Post were later returned to the Town's website; however, they were severed from the original post.

Throughout their exchanges, Leners threatened legal action against Schulte, threatened to call the sheriff during Town Board meetings, and heightened his effort to regulate property owned by Schulte.

## C. The April 2023 Meeting

In anticipation of the scheduled, annual meeting, the Town next posted an agenda on April 5, 2023, that included an opportunity for "discussions regarding any subjects brought up from the attendees."  On April 10, Leners further decided that participation at the 2023 annual meeting would be limited to qualified resident voters only.  As a result, at the annual Town meeting held on April 22, Schulte and others were prevented from expressing their support for recreational vehicle use in the Town.

## OPINION

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), plaintiff must allege "sufficient factual matter, accepted as true, to state a claim to relief

4

that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, or "that a recovery is very remote and unlikely." *Id.*

Here, defendants contend that the complaint is deficient for several reasons:

(1) the complaint identifies inappropriate and redundant defendants;

(2) plaintiff lacks standing for her injunctive and declaratory relief claims;

(3) plaintiff's activity on the Town website is not protected by the First Amendment;

(4) plaintiff's right to speak at the Town's annual meeting was not protected by the First Amendment;

(5) Leners is entitled to qualified immunity; and

(6) plaintiff has failed to plead facts against the Town to support a claim for municipal liability under *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978).

## I.  Appropriate Parties

As a threshold issue, defendants contend that claims against the Town of Cedar Lake Board of Supervisors and Chairman Leners, in his official capacity, should be dismissed as redundant. As for the Town of Cedar Lake Board of Supervisors, the court holds that it is not an entity that can be sued. Under Federal Rule of Civil Procedure 17(b), the capacity of a corporation to be sued is determined by the laws under which it was organized, which in this case is Wisconsin. *Buchanan v. City of Kenosha*, 57 F. Supp.

2d 675 (E.D. Wis. 1999).  The language of Wis. Stat.  § 60.01(2)(a) is explicit that only towns have been granted the power to sue or be sued.  Section 60.20 does not grant similar powers and duties to town boards or supervisors; rather, town boards have "charge of any action or legal proceeding to which the *town* is a party."  Wis. Stat. § 60.20(2).  From the inclusion of the power for towns to be sued and omission of that power with respect to town boards, this court holds that the Town of Cedar Lake Board of Supervisors is an improper party to this suit.

Nevertheless, plaintiff points to *Zelman v. Town of Erin*, 2018 WI App 50, 383 Wis. 2d 679, 917 N.W.2d 222, where Wisconsin Court of Appeals held that a town board rather than the town, was the proper respondent to a petition for a writ of certiorari.  However, as the court explained, this was because Wis. Stat. § 68.13(1) required writs of certiorari be brought against "the board or body whose acts are to be reviewed, otherwise the court cannot obtain jurisdiction either of the subject matter or the persons composing the board."  *Zelman*, 2018 WI App 50, ¶ 9.  In this case, plaintiff is not petitioning for a writ of certiorari, but rather for monetary and other relief based on the actions of the Town allegedly violating her constitutional rights.  Accordingly, the court dismisses her claims against the Town of Cedar Lake Board of Supervisors.

As for the claims brought against Town Board Chairman Leners, at least in his official capacity, the court agrees those claims are redundant with claims brought against the Town itself.  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).  For this reason,

federal district courts "routinely dismiss official capacity claims against individuals as 'redundant' where the appropriate municipality is also named." *Comsys, Inc. v. City of Kenosha Wisconsin*, 223 F. Supp. 3d 792, 802 (E.D. Wis. 2016). Because the Town of Cedar Lake is a named defendant in this action, therefore, the court will also dismiss the official capacity claims against Chairman Leners, in his official capacity, as redundant.

## II. Plaintiff's Remaining Request for Declaratory and Injunctive Relief

Defendants argues that plaintiff's remaining request for declaratory and injunctive relief are not ripe and, therefore, she lacks standing to proceed. To have standing for injunctive relief, plaintiffs must show that there is a

> (1) threat of an actually and imminent injury in fact,
> (2) causal relation between the injury and the conduct they wish to have enjoined and
> (3) likelihood, nor merely speculation or a hypothetical situation that they will have a favorable judicial decision that will either prevent or redress the injury.

*Goldhamer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010).

Plaintiff appears to have satisfied these elements. First, as discussed in detail below, Plaintiff has alleged facts giving rise to a reasonable inference that she suffered a constitutional injury because of the Town's moderation activity on its website, including its continued placement of plaintiff's comments apart from the September Post. Second, a reasonable inference can be drawn from those same facts that these injuries are the result of a moderation policy enforced by the Town. Third, there is a reasonable inference that this injury may at least be addressed through the *nominal* damages and restoration of comments to their original place on the Town's website, keeping plaintiff's case for

7

monetary and injunctive relief alive, if barely. *See Uzuegbunam* 592 U.S. at 292 ("a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right" and keeps a potentially moot case alive"). Therefore, the court will not dismiss this cause of action for lack of standing at its outset.

### III. Substantive Review of Plaintiff's claims

Next, the court must determine whether plaintiff has alleged sufficient facts against the remaining defendants to give rise to a legal claim and reasonable inference of recovery. Even read liberally, plaintiff's seven counts come down to four, distinct claims. First, the Town's content moderation policy as formulated and enforced by its Chairman Leners based on comments made under his September post infringed plaintiff's First Amendment rights. Second, the Town's decision to limit participation at the annual meeting to resident voters infringed the First and Fourteenth Amendments. Third, the actions of the Town through its Chairman Leners in response to plaintiff's comments on the September post also infringed her rights under the First and Fourteenth Amendments. Fourth and finally, the moderation policy was unconstitutionally vague. Accordingly, the court addresses these core claims in turn below.

### A. The September Post (Counts I & II)

The complaint alleges sufficient facts to create a reasonable inference that plaintiff's rights under the First Amendment were violated when Chairman Leners engaged in his so-called "moderation activity" on the September post. To begin, plaintiff claims a First

Amendment right to comment on the Town's website, which was violated by unilateral comments and subsequent deletion by Chairman Leners.  To resolve this issue, the court must determine if a reasonable inference exists that comments in interactive comment sections of the Town's website constitute protected speech.  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). If so, the court must then decide the nature of the forum.  *Id.*  Finally, the court determines if the justifications for exclusion satisfy the relevant standard.  *Id.*  Defendants contend that speech in the interactive comment section of a government-controlled website is not protected speech, or even if it is, they are allowed to discriminate against plaintiff's speech on a rational basis.

### 1.  Plaintiff's Comments Are Protected Speech

Defendants argue that the plaintiff's speech on the Town's website is government speech.  However, this argument is unpersuasive. As technology has developed, the Supreme Court has expanded First Amendment protections to less traditional channels, which are broadly defined as "locations or channels of communication that the government opens up for use by the public for expressive activity." *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011).  In keeping with this broad definition, courts have consistently found that comments in interactive sections of a government sponsored location or channel of communication are subject to First Amendment protections due to the ease of access, lack of an approval requirement, and the ability to reply directly to other users.  *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 239–40 (2d Cir. 2019) ("while the President's tweets can accurately be described as government speech, the retweets, replies, and likes of other users in response to his tweets are not government speech under any

formulation."); *Davison v. Randall*, 912 F.3d 666, 687–88 (4th Cir. 2019) (rejecting a government speech argument because the "interactive component of the Chair's Facebook Page—the portion of the middle column in which the public can post comments, reply to posts, and 'like' comments and posts—is materially different" than the portion of the page containing defendant's own posts); *Robinson v. Hunt Cnty., Texas*, 921 F.3d 440, 447–48 (5th Cir. 2019) (holding that expressive ideas shared on social media websites are protected speech); *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 954–55 (W.D. Wis. 2019) (comments on government maintained twitter accounts of state legislators were subject to First Amendment protections). Because all these features existed on the Town's website when plaintiff was engaged in interactive speech, the protections guaranteed by the First Amendment apply.

As a government website, defendants also argue that analogies to holdings involving social media platforms may be inappropriate, because generally they are static, serve a limited purpose, and do not create a place for back-and-forth communication. (Dkt. #12, at 10.) Whatever the merit of this distinction, however, the Town's website *did* allow users to comment, respond *and* generally engage in interactive communication. As for the website's limited purpose, this argument is more relevant in examining the nature of the forum as discussed below, rather than whether a participant's speech was in a public forum.

### 2. Forum Analysis

Having determined that plaintiff's speech in an open forum on the Town's website was protected, the next question is to the extent of protection due her speech under the Constitution. In part, this depends on the nature of the forum, and in particular, whether

or not the Town's website was (1) a "designated public fora," which the government creates by designating or opening a traditionally nonpublic forum open for public discourse; or (2) a "non-public fora," which is a place the government has opened "only for specific purposes or subjects." *Milestone v. City of Monroe*, 665 F.3d 774, 783 n.3 (7th Cir. 2011); *see also Pleasant Grove City v. Summum*, 555 U.S. 460 (2009). In a designated public forum, "speakers can be excluded … only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800. In a non-public forum, the government may reserve the use "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12 (2018).

Unsurprisingly, defendants contend that the Town's website is a *non*-public forum. After all, "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. To determine the Town's intent, however, courts must consider both explicit expressions about its intent, as well as "the policy and practice of the [Town, in order] to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.* Courts must also "examine[] the nature of the property and its compatibility with expressive activity to discern the government's intent." *Id.*

These considerations provide a reasonable inference that sections in a government-sponsored exchange open to public comment are designated public forums. Indeed, by

definition, the purpose of allowing interactive comment threads is to allow for public commentary and debate.  Additionally, comment sections on the Town's website are accessible to anyone with internet access.  Regarding the policy and practice surrounding the forum, at least at time of the September post, the Town had neither implemented a policy limiting the nature of public comments or replies permitted nor ever acted to restrict comments. Given the absence of a restriction on speakers or content, there is a reasonable inference that the Town at least initially intended to create a designated public forum, however unwittingly or thoughtlessly.

In contrast, defendants' contend that their website was a non-public forum, rooted in the holdings of *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314 (1st Cir. 2009), and *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834 (6th Cir. 2000).  Aside from not being controlling, however, the facts in both cases are distinguishable on key points.  First, unlike *Sutliffe*, where the court held that a municipality's consistent exercise of final authority over inclusion of some hyperlinks and the exclusion of others constituted government speech, 584 F.3d at 331, any posted content made by plaintiff or others were subject to *no* review or approval by the Town.  Second, unlike *Putnam*, where the website allowed content to be posted under certain express criteria *and* did not allow free and open dialogue between users, 221 F.3d at 844, the users on the Town's website appeared to be free to discuss their own stances and respond to other commenters on any issue they saw fit.

Ultimately, if defendants truly had no intention of creating a space for public interaction and discourse, they would not have opened their website up to public comments without express limitations on the subject matter or the ability for the users to

engage in open dialogue. Instead, the Town would have posted agendas, meeting minutes, and other miscellaneous updates without the ability for private individuals to post comments, as they apparently do now. Having opted to create unregulated comment sections, defendants cannot now divorce themselves from their First Amendment obligations. As a result, the court is left with a reasonable inference that the Town's comment section is a designated public forum subject to strict scrutiny. Further, as defendants advance no argument that Town Chairman Leners' actions would satisfy strict scrutiny, the court will not develop one on their behalf.

### B.  The April Meeting (Counts III & IV)

At the same time, the complaint fails to allege sufficient facts to give rise to a reasonable inference that plaintiff's constitutional rights were violated when the Town changed its annual meeting policy to prohibit non-residents from speaking. More specifically, defendants contend that plaintiff had no First Amendment right to speak at the Town's annual meeting, which allows all residents of the Town to gather as a legislative body, but "does not grant to members of the public generally a right to be heard." *Minnesota State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 283 (1984). Of course, a public body may be subject to constitutional constraints when "by its own decision or under statutory command, determined to open its decisionmaking processes [i.e., legislative process] to public view and participation. In such case, the state body has created a public forum dedicated to the expression of views by the general public." *City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Emp. Rels. Comm'n*, 429 U.S. 167, 178–79 (1976). In this case, however, the Town did *not* open its decisionmaking process to the public.

In Wisconsin, annual meetings are a requirement of all towns during which resident voters may decide on any business over which a standard town board meeting would have jurisdiction. Wis. Stat. § 60.11(1 & 6). At these meetings, all actions are put to a vote, all questions are decided by a majority of the electors voting, and "any qualified elector of the town, as defined under ch. 6, may vote." Wis. Stat. § 60.14(1 & 2). In other words, these meetings are an opportunity for resident voters to act as legislators participating in direct democracy, empowered to make change and repeal laws as opposed to regular town board meetings, where that power is delegated to an elected board.

Moreover, with the authority to bind the entire town, annual meetings are undoubtably a policymaking organ, comprised of registered voters. *See also Curnin v. Town of Egremont*, 510 F.3d 24, 26 (1st Cir. 2007) ("A town meeting is a legislative body in deliberation."). And as a policymaking organ, the operation of an annual meeting is free from "a constitutional constraint requiring them to afford every interested member of the public an opportunity to present testimony before any policy is adopted." *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 284 (1984). This freedom from constitutional constraint extends even to members of the public who may have a special interest in a policy decision. *Id.* at 286 ("status as public employees, however, gives them no special constitutional right to a voice in the making of policy by their government employer"). With no constitutional constraints requiring the Town to afford plaintiff an opportunity to speak as a non-resident, therefore, there can be no reasonable inference drawn that her First Amendment rights were violated by exclusion from participation in an annual meeting of residents.

14

Of course, plaintiff disagrees, arguing that constitutional constraints extended to the Town's annual meeting when it permitted resident voters to participate at the meeting. However, this argument falls short on one key point: during the Town's annual meeting, resident voters are acting in their capacity as town legislators and are part of the policymaking organ, not the public.[2]  Without an opportunity for people outside of the decisionmaking body to participate, plaintiff's comparison to case law where constitutional constraints attached to participation are easily distinguished.  *E.g., City of Madison, Joint Sch. Dist. No. 8*, 429 U.S. at 176 (1976) (a statute could not force a policymaking body to discriminate between speakers when it "sits in public meetings to conduct public business and hear the views of citizens"); *Surita*, 665 F.3d at 869 ( "there is no doubt that audience time during a [policymaking] meetings constituted a designated open forum"); *Princeton Ed. Ass'n v. Princeton Bd. of Ed.*, 480 F. Supp. 962, 969 (S.D. Ohio 1979) (policy that prohibited nonresident teachers from discussing terms and conditions of employment but allowed residents to speak on the matter during policymaking meetings ran afoul of the constitution).  Even as alleged by plaintiff in this case, only resident voters acting as members of the Town legislature for the day were allowed to participate during the annual meeting.  In other words, the Town did *not* open its decisionmaking process to the public by allowing residents to participate at its annual meeting.  Therefore, there is no reasonable inference that the First Amendment protected plaintiff's right to participate at the annual

---

[2] Unlike the town meetings at issue here, if resident voters were *not* acting in a legislative capacity, additional review may be required, though even then, the restriction would still apply at worst to a non-public forum.

meeting or that the First Amendment was violated by her exclusion from participating at that meeting.

## C. Retaliation (Count V)

Plaintiff next asserts her amended complaint states a viable First Amendment retaliation claim under § 1983 by "plausibly alleg[ing] that (1) [she] engaged in activity protected by the First Amendment, (2) [she] suffered an adverse action that would likely deter future First Amendment activity, and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to retaliate." *Santana v. Cook Cnty. Bd. of Rev.*, 679 F.3d 614, 622 (7th Cir. 2012).

The court agrees. As has already been discussed at length, plaintiff's participation in the interactive comment forum on the Town's website was an activity protected by the First Amendment. In response to her comments, Town Chairman Leners nevertheless stated that further participation by plaintiff specifically would not be allowed, moved her comments to a disjointed portion of the Town's website, threatened legal action against plaintiff, threatened to call the Sheriff, *and* took action to regulate property owned by plaintiff. As many of these actions would deter a reasonable person from exercising their First Amendment rights, it is reasonable to infer that plaintiff has pleaded a viable claim for retaliation.

## D. Deprivation of Fourteenth Amendment Rights (Count VI)

Finally, defendants argue that "[b]ecause Count VI is based on alleged First Amendment violations, it is 'subsumed into the First Amendment claims [that p]laintiff

16

brings under § 1983.'" (Dkt. #9 at 35) (citing *Little v. Ill. Dep't of Revenue*, 2002 U.S. Dist. LEXIS 8625 at  (N.D. Ill. May 14, 2002), *Id*. at *18-19. While sympathetic to the argument that plaintiff's basic claim sound solely, if not exclusively, under the First Amendment for reasons already addressed above, "[i]n those instances when an imprecise law implicates speech and assembly rights, an injured plaintiff may also facially challenge a statute as void for vagueness." *Bell v. Keating*, 697 F.3d 445, 455 (7th Cir. 2012). Therefore, the court will not dismiss plaintiff's Fourteenth Amendment vagueness claim at the pleading stage, plaintiff is encouraged to consolidate the essential nature of her claims going forward.

## IV. Qualified Immunity

As for plaintiff's remaining claims against Chairman Leners in particular, "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Having found that a reasonable inference can be drawn that Chairman Leners violated plaintiff's constitutional right through his unilateral "moderation activity" on the Town's website, the question becomes whether that right was "clearly established" at the time of his conduct.[3]

---

[3] Although retaliation and vagueness claims were alleged against Leners, the parties did not argue in their briefing whether qualified immunity applied to Leners on these claims. Therefore, the court will not extend its analysis to those claims at this time.

"A government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would [have understood] that what he is doing violates that right." *Id.* at 741. This standard does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate," *id.*, something generally accomplished by citation to "controlling authority" in the jurisdiction at the time of the alleged violation or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Here, plaintiff concedes that there is neither a U.S. Supreme Court nor Seventh Circuit Court of Appeals decision clearly establishing that First Amendment rights extend to online interactive comment sections. However, plaintiff has cited to four circuit court cases predating Leners' activity that found that government action moderating interactive comment sections violated the First Amendment. *See Davison v. Randall,* 912 F.3d 666, 688 (4th Cir. 2019) (defendant engaged in viewpoint discrimination when she banned users from a Facebook page she held out as her "county Facebook page"); *Robinson v. Hunt Cnty., Texas*, 921 F.3d 440, 449-50 (5th Cir. 2019) (plaintiff plausibly alleged that defendants engaged in viewpoint discrimination when they banned her from the County Sheriff's Office Facebook page); *Garnier v. O'Connor-Ratcliff,* 41 F.4th 1158, 1183 (9th Cir. 2022) (defendants engaged in viewpoint discrimination when they banned users from their Facebook pages that they described as "government official"); *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 239 (2d Cir. 2019) (President Trump engaged

in viewpoint discrimination when he banned other users on his personal Twitter account that bore "all the trapping of an official, state-run account"). In all of those cases, federal courts of appeal found that First Amendment rights existed to comment in interactive sections on government posts and, regardless of the type of forum, moderation activity that discriminated based on viewpoint violated that right. Given this broad consensus among these four circuits on this issue, the court is satisfied that a reasonable official could not have believed that Chairman Leners' moderation of an interactive comment section based on viewpoint was lawful.

Still, Chairman Leners contends that these four cases are insufficient to show plaintiff's right was clearly established. Chairman Leners first argues that this court should not rely on *Garnier* and *Robinson* in determining whether the law was clearly established because those cases both found the respective defendants were entitled to qualified immunity. However, the rationale supporting those decisions relied on a record that is easily distinguishable from the present case. At the time of its decision in *Garnier*, the Ninth Circuit found a lack of consensus regarding the protections due interactive comment sections because "[a]t the time the [defendants] blocked the [plaintiffs] from their pages in the fall of 2017, there were *no* court of appeals cases addressing similar facts." 41 F.4th at 1184 (emphasis added). However, by the time the defendant here acted, *four* circuits had unanimously opined that First Amendment protections applied. Just like in *Garnier*, the offending conduct in *Robinson* occurred before any federal circuit court had addressed what protections should be extended to interactive comment sections. Further, the *Robinson* court did not even address whether qualified immunity applied as the plaintiff in

that case did not raise the issue on appeal.  921 F.3d at 446.  In contrast, all of the cases analyzed, including *Garnier* and *Robinson*, *predate*d Chairman Leners' actions, providing a consensus of persuasive authority to question if legality.

Chairman Leners next rehashes his argument that case law discussing social media websites are not analogous because government websites and social media do not share the same purpose.  However, this argument ignores the analysis performed in these four cases.  Specifically, the circuit courts recognized that different facets of the websites and posts have different purposes that alter their treatment under the First Amendment; namely, each court found the difference between an original post from government actors and a citizen's comment left in the interactive comment section.  Most importantly, all the circuits have agreed that interactive comment sections are public forums.  Indeed, an interactive comment section on a government-created website would seem more obviously to create First Amendment rights than one created by a sole legislator or council person.

Finally, Chairman Leners argues that previous court decisions only discuss the interactive portions of government social media pages, not whether a town website is a forum.  Thus, defendant argues, these decisions fail to define a right with sufficient particularly, especially given decisions in *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314 (1st Cir. 2009), and *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834 (6th Cir. 2000).  However, this argument conflates a separate issue.  Plaintiff's contention is specific to the interactive comment section of the Town's website *not* to the website as a whole.  As the court has already explained, circuit court opinions have consistently and now repeatedly held that First Amendment protections *do* extend to interactive comment sections.  Plus, these cases

20

are largely addressing *government* speech, or a non-public forum, not government exclusion of speech in a public forum. Finally, neither case cited by defendants even discuss the propriety of government moderation of interactive comment sections on its website, much less suggest a lack of consensus on that subject.

In sum, the four circuit court cases before this court demonstrate that at the time of Chairman Leners' actions a clearly established First Amendment right existed that protects citizen participation in interactive comment sections, such that a reasonable official would not have believed that the actions Chairman Leners took were lawful. Therefore, he is not entitled to qualified immunity on the facts presented in this case to date.

## V. Town Liability[4]

To recover against a municipality under Section 1983, a plaintiff must show that they were deprived of a constitutional right by an "official policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Moreover, when a particular course of action is directed by those who set municipal policy, the municipality is generally responsible under Section 1983, even if the action in question is undertaken only once. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009). Thus, an official policy or custom may be proven by

> showing that (1) the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and

---

[4] Similarly to the briefing on qualified immunity, the parties did not argue whether municipal liability extended to the retaliation and vagueness claims brought in plaintiff's amended complaint. Therefore, the court will not extend its analysis to those claims.

> promulgated by that body's officers; … (2) the constitutional deprivations were visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels; *or* (3) the deprivation was made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

*Bradley v. Vill. of Univ. Park*, Illinois, 929 F.3d 875, 884 (7th Cir. 2019) (emphasis added, internal citation and quotations omitted).  "Officials with final decisionmaking authority are deemed policymakers for *Monell* purposes."  *Valentino*, 575 F.3d at 676.

In this case, plaintiff argues that she has alleged sufficient facts to reasonably infer that the Town is liable for viewpoint discrimination under all three grounds.  First, Leners exercised final decisionmaking authority.   Second, the Town Board exercised final decisionmaking authority.   Third, the moderation policy was a widespread practice.  Finding that plaintiff's allegations satisfy the first of these grounds, the court need not address the other two.

"The determination of whether a person has policymaking authority is a question of state law and is to be decided by the court." *Valentino*, 575 F.3d at 675.  The individual only needs to be the final decisionmaker on the particular issue before the court.  *Id.* at 676.  In determining whether an official is a final decisionmaker, courts generally consider:

> (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.

*Id.* (internal quotations omitted).

As alleged, these considerations allow for a reasonable inference that Leners was a final decisionmaker on the issue of website moderation. As for the constraints by policies

22

or officials, Leners did not call for a special meeting with other members of the Town Board. Instead, he made a judgment call to censor plaintiff's comments for being disrespectful and derogatory. As for the meaningful review, the Town Board never voted to approve or disapprove Leners' actions despite being apprised of them. Instead, the Town Board voted to absolve themselves of all future moderation responsibilities by removing comment sections. Finally, as for Leners' grant of authority, Wis. Stat. § 60.24(1)(e)2 directs the chairperson of a town's board to act on the town boards behalf to "[s]ee that peace and order are maintained in the town." Leners' justification for his actions to prevent any dialogue in the comment section from getting worse or the incitement of violence further gives rise to a reasonable inference that he was acting under his statutory authority.

Furthermore, the behavior of Leners has many similarities to those taken by the Mayor in *Valentino*. Like *Valentino*, where the mayor made termination decisions without recommendations from his village board, 575 F.3d at 677-78, Leners allegedly made censorship decisions without input from the rest of the Town Board. Also, like *Valentino*, where the personnel decisions made by the mayor were not reviewed by the village board, *id*. at 678, the Town Board declined to take a vote regarding Leners' conduct, leaving it unreviewed.

Nevertheless, defendants contend that comparisons to *Valentino* are inappropriate because, in the absence of other controlling law, Wis. Stat. § 60.22(1) expressly reserves website moderation decisions with the Town Board. Thus, defendants argue, unlike in *Valentino*, where the defendants failed to identify a reservation of authority to the board on personnel decisions, *id*. at 677, the Town Board did just that. However, this distinction

23

is not material at this stage of the litigation, since it involves considering the alleged facts *and* drawing reasonable inferences in the light most favorable to plaintiff, allowing for a reasonable inference that Leners authority to engage in content moderation on the website can be found in Wis. Stat. § 60.24(1)(e)2.

Having found facts sufficient to reasonably infer that the Town deprived plaintiff of First and Fourteenth Amendment rights through a discriminatory moderation policy created and enforced by Leners, the court will allow plaintiff to proceed on this claim against the Town.

## ORDER

For the reasons stated above IT IS ORDERED that:

1) Defendant's motion to dismiss (dkt. 8) is **GRANTED** with respect to all counts brought against the Town of Cedar Lake Board of Supervisors and Kenneth J. Leners in his official capacity;

2) **GRANTED** with respect to counts 3 and 4 against all defendants;

3) **DENIED** with respect to counts 1, 2, 5, 6, and 7 against the Town of Cedar Lake and Keneth J. Leners in his individual capacity.

Entered this 16th day of April, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge